UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

CASE NO.:

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ALAN H. NEW,
DAVID N. KNUTH, and
SYNERGY INVESTMENT SERVICES, LLC,

Defendants.

_____

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## INTRODUCTION

1.      From at least September 2013 through August 2017, the Defendants in this action served as unregistered brokers on behalf of Woodbridge Group of Companies LLC and its affiliates ("Woodbridge"), raising approximately $15 million from the offer and sale of Woodbridge's unregistered securities to at least 100 retail investors located in at least nine states. The Defendants, all based in Fort Wayne, Indiana, collectively earned more than $1.5 million in transaction-based sales commissions.

2.      The Defendants pitched investors, both pre-existing customers and newly found, via telephone, e-mail and at in-person meetings providing them Woodbridge's sales materials touting Woodbridge's securities as "safe and secure."

3.      Unbeknownst to the Defendants' customers, many of whom had invested their retirement savings in response to the Defendants' sales pitches, Woodbridge was actually

operating a massive Ponzi scheme, raising more than $1.2 billion before collapsing in December 2017 and filing for bankruptcy.  Once Woodbridge filed for bankruptcy, investors stopped receiving their monthly interest payments, and have not received a return of their investment principal.

4.     At all relevant times, the Defendants sold Woodbridge's securities without being registered with the Commission to do so, nor were they associated with a registered broker-dealer who was selling Woodbridge's securities.  Further, Woodbridge's securities were not registered with the Commission nor did they qualify for an exemption from registration.  Defendants were thus not permitted to sell Woodbridge's securities.

5.     By engaging in this conduct the Defendants each violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].  Unless enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws. The Commission also seeks against all Defendants disgorgement of ill-gotten gains along with prejudgment interest thereon, and civil money penalties.

## DEFENDANTS

6.     **Alan H. New**, 43, is a resident of Fort Wayne, Indiana, and is a co-owner of Synergy Investment Services, LLC (f/k/a Synergy Financial Group, Inc.; f/k/a Synergy Financial Group, LLC; f/k/a Lighthouse Wealth Management) ("Synergy").  From at least March 2015 to August 2017, New personally solicited and sold unregistered Woodbridge securities not held or offered by his employing broker-dealer to retail investors in at least nine states.  At no point during this period, was New registered as, or associated with, a broker-dealer selling Woodbridge's securities.

7.      **David N. Knuth**, 62, is a resident of Fort Wayne, Indiana, and is a co-owner of Synergy.  From at least September 2013 to August 2017, Knuth personally solicited and sold unregistered Woodbridge securities to investors located in at least nine states.  Knuth was never registered as, or associated with, a broker-dealer selling Woodbridge's securities.

8.      **Synergy** is an Indiana limited liability company, wholly owned by New and Knuth, with offices in Fort Wayne, Indiana, engaged in the business of selling investment products, including Woodbridge's securities, to retail investors.  Since August 30, 2016, Synergy has been registered in Indiana as an investment adviser firm, but was never registered with the Commission as a broker-dealer.

## JURISDICTION

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

10.     This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Indiana.  Several of the Defendants' clients who invested in the Woodbridge's securities reside in the Southern District of Indiana, and these clients invested at least $525,000 in these securities.

11.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## FACTUAL ALLEGATIONS

12.     Beginning in July 2012 through at least December 4, 2017, Robert H. Shapiro ("Shapiro") and Woodbridge orchestrated a massive Ponzi scheme raising in excess of $1.22 billion from the sale of unregistered securities to over 8,400 investors nationwide.  At least 2,600 of these investors used their Individual Retirement Account funds to invest nearly $400 million.  The Defendants, based in Fort Wayne, Indiana, are collectively responsible for raising approximately $15 million from approximately 100 investors.

### A.  Woodbridge's Securities and Representations to Investors

13.     Woodbridge sold investors two primary types of securities:  (1) twelve-to-eighteen month term promissory notes bearing 5%-8% interest that Woodbridge described as First Position Commercial Mortgages ("FPCM Note" and "FPCM Investors"), which were issued by one of Woodbridge's several affiliated Fund Entities, and (2) seven different private placement fund offerings with five-year terms: (a) Woodbridge Mortgage Investment Fund 1, LLC; (b) Woodbridge Mortgage Investment Fund 2, LLC; (c) Woodbridge Mortgage Investment Fund 3, LLC; (d) Woodbridge Mortgage Investment Fund 3A, LLC; (e) Woodbridge Mortgage Investment Fund 4, LLC; (f) Woodbridge Commercial Bridge Loan Fund 1, LLC; and (g) Woodbridge Commercial Bridge Loan Fund 2, LLC; (collectively "Fund Offerings" and "Fund Investors").

#### 1.  FPCM Notes

14.     Woodbridge represented that the FPCM Note was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives."  The purported revenue source enabling Woodbridge to make the payments to FPCM Investors was the interest Woodbridge would be receiving from mainly one-year loans to supposed third-party commercial property owners ("Third-Party Borrowers").  Woodbridge told investors that these Third-Party

Borrowers were paying Woodbridge 11-15% annual interest for "hard money," short-term financing. Woodbridge would secure the debt through a mortgage on the Third-Party Borrowers' real estate. For example, Woodbridge wrote in marketing materials that "Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your [FPCM] documents."

15.     The FPCM Investors invested their funds with the expectation of earning the promised returns while maintaining a secured interest in a parcel of real estate.

16.     The profitability of the FPCM investments was derived solely from the efforts of Shapiro and Woodbridge and the investments were in a common enterprise. Once investors provided their funds to Woodbridge, their funds were commingled with other investors' funds and used by Woodbridge for general business purposes. Investors had no control over how Shapiro and Woodbridge used their money. Because Woodbridge was a Ponzi scheme, its ability to pay returns depended upon its continued ability to raise funds from new investors and convince existing investors to rollover their investments. Information materials from Woodbridge informed investors that it conducted all due diligence including title search and appraisal on the commercial property and borrower. The investors played no role in selecting which properties would purportedly secure their investments. Marketing materials from Woodbridge also reassured investors, telling them not to worry about borrowers failing to make their loan payments because Woodbridge would continue to pay investors their interest payments.

### 2. Fund Offerings

17.     Woodbridge offered the Fund Offerings to investors through one of its affiliated Fund Entities, pursuant to purported exemptions from registration under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from

investors.  In the Regulation D filings, Woodbridge described the Fund Offerings as "equity" securities.

18.     Woodbridge, in an attempt to avoid registration of its securities with the Commission, purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly to Fund Investors and a 2% "accrued preferred dividend" to be paid at the end of the five-year term and a share of "profits."  Neither Woodbridge nor the Defendants ensured that only accredited investors purchased the Fund Offerings (or the FPCMs).

19.     In the offering memoranda for the Fund Offerings, Woodbridge represented to Fund Investors that their funds would be used for real estate acquisitions and investments, notably including Woodbridge's FPCMs.  The Fund Offerings, in effect, were investments into pooled FPCMs.  Many of these pools contained 40 or more investors.

20.     Investors in the Fund Offerings invested in a common enterprise with the expectation of profit based on the efforts of others.  The allegations of paragraph  15  and  16  of this Complaint are applicable to the Fund Offerings as well.

21.     The FPCM Notes and the Fund Offerings are securities within the meaning of Securities Act § 2(a)(1), 15 U.S.C. § 77b(a)(1), and Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10).  Investors were unquestionably motivated by the high rate of returns that Woodbridge offered and investors viewed these as passive investments generating safe returns.  Woodbridge sold the FPCM notes to a broad segment of the public (at least 8,400 investors) through general solicitations and there were no risk-reducing factors indicating the FPCM notes were not securities. Neither the FPCM Notes nor the Fund Offerings were registered with the Commission, and there was no applicable exemption from registration.

**B. Woodbridge's Misrepresentations**

22.     Woodbridge's claim to be making high interest rate loans to "third party" borrowers was a lie.  In reality, Woodbridge's business model was a sham.  Investors' funds were used to purchase, in the name of a Shapiro controlled Limited Liability Company (LLC), almost 200 residential and commercial properties, primarily in Los Angeles, California and Aspen, Colorado. Thus, nearly all the "third-party" borrowers were Shapiro owned and controlled LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors.

23.     Because Shapiro's LLCs were not making any of the promised interest payments and Woodbridge's other revenue was minimal, Woodbridge sought to convince FPCM Investors to rollover their investment into a new note at the end of the term, so as to avoid having to come up with the cash to repay the principal.  For the payment of returns to FPCM and Fund Investors and redemptions to FPCM Investors who did not rollover their notes, Woodbridge raised and used new investor funds, in classic Ponzi scheme fashion.

24.     Finally, on December 1, 2017, after amassing more than $1.22 billion of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first interest payments to investors after purportedly ceasing their fundraising activities.  Without the infusion of new investor funds, just days later, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

25.     In the Chapter 11 Bankruptcy, Woodbridge, now under the control of independent management, has taken the position that the FPCM Investors do not have a secured interest in the property underlying their investment because they were required to perfect their interest pursuant to the requirements of the Uniform Commercial Code, which virtually none of the investors did.

### C.     Defendants Offered and Sold Woodbridge Securities

26.     Woodbridge recruited a network of several hundred external, mostly unregistered, sales agents, including the Defendants.  Woodbridge provided the Defendants with the information and marketing materials that the Defendants gave to FPCM and Fund Investors.

27.     Using the Woodbridge-provided materials, the Defendants solicited prospective investors from the general public via email, telephonic and particularly with in-person meetings. The Defendants established individual relationships with clients and met with them to sell them on the investment.

28.     Once in contact with a potential investor, the Defendants assured the safety and profitability of the Woodbridge investment.  The Defendants touted the purported security of the properties the investments were tied to by virtue of their favorable loan-to-value ratios, Woodbridge's long tenure and track record in the industry, the purported first-position lien the investors would have on the properties in the event of a default by the "third party" borrower, and assured investors that an investment in Woodbridge was a more profitable alternative than traditional investments such as bank certificates of deposits, and safer than the stock market.

29.     If a customer decided to invest in the FPCM note program, the Defendants filled out a Woodbridge online form identifying their customer, the amount of investment (with the minimum being $25,000), and selecting the Woodbridge property that would purportedly collateralize the customers' note.  Woodbridge's processing department then generated a loan agreement and promissory note and sent the documents to the Defendants.  Investors typically provided the Defendants the signed documents and the check for their principal investment, and the Defendants returned the package to Woodbridge.  The investor then received monthly interest payments directly from Woodbridge.

30.     Woodbridge offered its FPCM notes to Defendants at a 9% wholesale annual interest rate, who then would offer these notes to their investor clients at 5% to 8% annual interest rate—the difference representing the Defendants' transaction-based commissions.

31.     For the Fund Offerings, each of the Defendants received a 5% sales commission that Woodbridge purposefully mischaracterized as a "marketing bonus" to avoid the appearance of paying transaction-based commissions.

32.     The Defendants had some of their customers rollover their investments at their term expiration, either into another 12-18 month FPCM note, or into a five-year Fund Offering. Defendants received transaction-based sales commissions for rollovers, with a five-year Fund Offering rollover receiving a greater commission than a FPCM rollover.

33.     Overall, the Defendants raised approximately $15 million from the offer and sale of Woodbridge's unregistered securities to at least 100 retail investors located in at least nine states. Woodbridge paid Synergy, which New and Knuth split evenly, $1,507,469 in transaction-based sales commissions through this arrangement.

34.     At all relevant times, the Defendants sold Woodbridge's securities without being registered with the Commission to do so, nor were they associated with a registered broker-dealer who was selling Woodbridge's securities.  Further, Woodbridge's securities were not registered with the Commission nor did they qualify for an exemption from registration.  Defendants were thus not permitted to sell Woodbridge's securities.

## CLAIMS FOR RELIEF

## COUNT I

## Violations of Sections 5(a) and 5(c) of the Securities Act

35.     The Commission repeats and realleges paragraphs 1 through 34 of this Complaint as if fully set forth herein.

36.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities offered and sold by the Defendants as described in this Complaint and no exemption from registration existed with respect to these securities.

37.     From as early as September 2013 and continuing through approximately August 2017, the Defendants directly and indirectly:

(a)     made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)     carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)     made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security;

without a registration statement having been filed or being in effect with the Commission as to such securities.

38.     By reason of the foregoing the Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 15(a)(1) of the Exchange Act

39.     The Commission repeats and realleges Paragraphs 1 through 34 of this Complaint as if fully set forth herein.

40.     From as early as September 2013 and continuing through approximately August 2017, the Defendants, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer.

41.     By reason of the foregoing, the Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.

### Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining all Defendants from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] and Section 15(a)(1) [15 U.S.C. § 78o(a)(1)] of the Exchange Act.

**B.**

**Disgorgement and Prejudgment Interest**

Issue an Order directing the Defendants to disgorge all ill-gotten gains or proceeds received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

**C.**

**Civil Money Penalties**

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) [15 U.S.C. § 77t(d)] of the Securities Act and Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] of the Exchange Act.

**D.**

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

**E.**

**Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

December 17, 2018                              Respectfully submitted,

                                  By:       */s/ Russell Koonin & Christine Nestor*
                                             Russell Koonin & Christine Nestor
                                             Senior Trial Counsel
                                             kooninr@sec.gov; nestorc@sec.gov
                                             FL Bar No.: 474479; FL Bar No. 597211
                                             Telephone: (305) 982-6385; (305) 982-6367

*/s/ Scott A. Lowry*
Scott A. Lowry
Senior Counsel
lowrys@sec.gov
D.C. Bar No. 492865
Telephone: (305) 982-6387

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154