UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:18-cv-03975-SEB-MJD |
| ALAN H. NEW, DAVID N. KNUTH, SYNERGY INVESTMENT SERVICES, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER IMPOSING DISGORGEMENT, CIVIL PENALTIES, AND PREJUDGMENT INTEREST**

The Securities and Exchange Commission ("SEC") initiated this action on December 17, 2018, charging Defendants with selling unregistered securities in violation of 15 U.S.C. § 77e(a) and selling securities without registering as brokers or dealers in violation of 15 U.S.C. § 78o(a). Dkt. 1. On September 29, 2021, we granted the SEC's motion with respect to its requested injunctive relief, to which Defendants fully consented, permanently enjoining Defendants from future violations of the provisions of the federal securities laws identified in the SEC's complaint. *See* dkt. 40. However, Defendants have objected to the SEC's requested entry of disgorgement and civil money penalties, which are the only remaining issues requiring an adjudication in this litigation. *See, e.g.*, dkt. 32; dkt. 38. For the reasons explicated below, Mr. New is hereby ordered to pay $250,518.50 as disgorgement damages along with an additional $48,297.35 in

1

prejudgment interest, Mr. Knuth is hereby ordered to pay $230,435.60 as disgorgement damages and an additional $44,425.60 in prejudgment interest, and Synergy is hereby ordered to pay $1,026,513.70 as disgorgement damages and an additional $197,901.17 in prejudgment interest. Mr. New is further ordered to pay $50,000 as a civil penalty, Mr. Knuth is ordered to pay $50,000 as a civil penalty, and Synergy is ordered to pay $100,000 as a civil penalty.

### **Factual Background**

Defendants stipulate that the allegations set out in the SEC's complaint are true for purposes of resolving the issues remaining before the Court. Thus, we recount below only those facts relating to the disgorgement and the imposition of civil penalties.

Defendant Synergy Investment Services, LLC ("Synergy"), an Indiana limited liability company wholly owned by Mr. New and Mr. Knuth and located in Fort Wayne, Indiana, was engaged in the business of selling investment products to retail investors. Compl. ¶¶ 6–8. From at least September 2013 through August 2017, Defendants served as unregistered brokers acting on behalf of Woodbridge Group of Companies LLC and its affiliates ("Woodbridge") and earning approximately $15 million from the offer and sale of Woodbridge's unregistered securities to no fewer than 100 retail investors residing in at least nine states. Defendants collectively earned in excess of $1.5 million from transaction-based sales commissions. *Id.* at ¶¶ 1, 12, 33. These sales were unlawful because Defendants were not registered with the SEC and thus lacked authorization to sell Woodbridge's securities and because they were not associated with a registered broker-dealer selling Woodbridge's securities. In addition, Woodbridge's securities were

not registered with the SEC, nor did they qualify for an exemption from registration. *Id.* at ¶¶ 4, 6–8, 21, 34.

Defendants had been recruited by Woodbridge to sell these securities, which company provided information and marketing materials for distribution to investors. *Id.* at ¶ 26. These sales materials touted the Woodbridge securities as "safe and secure." *Id.* at ¶ 2. Many of Defendants' customers invested sizeable sums, including their individual retirement savings, in response to Defendants' sales pitches. Beginning in July 2012 through at least December 4, 2017, Robert H. Shapiro ("Shapiro") and Woodbridge operated a massive Ponzi scheme, producing more than $1.2 billion from the sale of unregistered securities to more than 8,400 investors nationwide, which scheme collapsed in December 2017, and forced them into bankruptcy. *Id.* at ¶¶ 3, 12. Once Woodbridge filed for bankruptcy, investors no longer received monthly interest payments or any payouts of their investment principal. *Id.* at ¶¶ 3, 24.

On November 17, 2018, the SEC brought suit, filing its Complaint for Injunctive and Other Relief against Defendants [Dkt. 1], followed by a Motion for Entry of Final Judgments of Permanent Injunction and Imposing Disgorgement, Prejudgment Interest, and Civil Penalties on April 12, 2019. Dkt. 11. In support of its motion, the SEC attached as an exhibit consent forms executed by each of the Defendants agreeing to permanent injunctive relief against them. Dkt. 12-1. On November 26, 2019, prior to a ruling on the SEC's motion [Dkt. 11], Defendants sought a stay of this litigation [Dkt. 25] to await the outcome of the Supreme Court review in *Liu v. Securities and Exchange Commission*, 140 S.Ct. 1936 (2020), addressing whether the SEC can seek disgorgement as a form of

equitable relief or whether disgorgement constitutes a penal remedy. Following the Supreme Court's decision on July 24, 2020, we granted Plaintiff's unopposed Motion to Reopen Case. Dkt. 28. The parties briefed the pending issues in light of *Liu* and addressed certain unresolved factual issues. The Court granted the SEC's request for injunctive relief permanently enjoining Defendants from future violations of Section 5 of the Securities Act (15 U.S.C. § 77e) and Section 15(a)(1) of the Exchange Act (15 U.S.C. § 78o(a)(1)), but deferred a ruling as to disgorgement, prejudgment interest, and civil money penalties pending further evidentiary submissions. *See* dkt. 40. We resolve these issues below.

  The SEC seeks an order directing Mr. New to pay $250,518.50 as disgorgement damages as well as an additional $48,297.35 in prejudgment interest,[1] an order directing Mr. Knuth to pay $230,435.60 as disgorgement damages plus $44,425.60 in prejudgment interest, an order directing Synergy to pay $1,026,513.70 as disgorgement damages plus $197,901.17 in prejudgment interest, and an order directing each Defendant individually to pay $200,000 as a civil penalty. Our review of the evidence submitted supports a conclusion based on a preponderance of the evidence that the SEC's proposed disgorgement amounts represent reasonable approximations of the amounts of Defendants' ill-gotten gains and that these proposed remedies are appropriate, particularly in light of Defendants' failure to satisfy their burden to show that the SEC's estimations are invalid, inaccurate, or otherwise unreliable. The civil penalty reduced from the SEC's

---

[1] Defendants consented to pay prejudgment interest calculated from December 1, 2017 to the date of entry of a final judgment.

request to the amount of $50,000 for each individual Defendant (Mr. New and Mr. Knuth) and of $100,000 for Synergy imposed herein reflects Defendants' entitlement to appropriate mitigation.

## Discussion

### I.  Disgorgement

Disgorgement is a "well-established equitable remedy in Commission enforcement actions." *See SEC v. Lipson*, 278 F.3d 656, 662–63 (7th Cir. 2002). In *Liu*, the Supreme Court affirmed this principle, holding that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [Title 15 U.S.C.] § 78u(d)(5)." 140 S. Ct. at 1940. Accordingly, "[c]ourts may not enter disgorgement awards that exceed the gains 'made upon any business or investment, when both the receipts and payments are taken into the account.'" *Id.* at 1949–50 (quoting *Rubber Co. v. Goodyear*, 9 Wall. 788, 804, 19 L. Ed. 566 (1870)). Thus, "courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Id.* at 1950.

The SEC bears the burden of establishing its entitlement to the requested remedies by a preponderance of the evidence. *SEC v. Slowinksi*, No. 1:19-CV-03552, 2020 WL 7027639, at *3 (N.D. Ill. Nov. 29, 2020) (citing *Steadman v. SEC,* 450 U.S. 91, 103 (1981)). "But disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Id.* Salaries and other forms of compensation may be disgorged. *SEC v. Black*, No. 04 C 7377, 2009 WL 1181480, at *2 (N.D. Ill. Apr. 30, 2009) (citing *SEC v. Koenig*, 557 F.3d 736, 744–45 (7th Cir. 2009)). "[A] monetary award often depends on estimation, for defendants may not keep (or may conceal) the

data required to make an exact calculation." *FTC v. QT, Inc.*, 512 F.3d 858, 864 (7th Cir. 2008). Once the government provides a reasonable estimate, the defendants bear the burden of showing that the estimate is inaccurate. *See id.*

The Defendants have stipulated that they received a total of $1,507,469 in transaction-based sales commissions from their relationship with Woodbridge; this figure reflects the amount of ill-gotten gains. This is the amount to be borne by and allocated among Mr. New, Mr. Knuth, and Synergy. The parties have agreed that it is fair, reasonable, and appropriate to calculate disgorgement for the individual defendants, Mr. New and Mr. Knuth in the following fashion: by adding the individual wages and K-1 Profits, as to each Defendant's respective earnings from the Woodbridge business,[2] from which a deduction should occur to reflect the collective settlement payments related to Woodbridge that Defendants have already paid to third parties, split evenly between Mr. New and Mr. Knuth.[3] The parties have stipulated to these disgorgement amounts prior to any award of prejudgment interest.

Three underlying issues remain for resolution by the Court: (1) whether Mr. Knuth may deduct from his disgorgement amount the full amount of a claim he surrendered in the Woodbridge Liquidation bankruptcy, (2) whether, pursuant to *Liu*, Mr. New and Mr.

---

[2] The individuals' wages and K-1 Profits, calculated on the basis of the tax returns provided by Defendants, represent the distribution received by Mr. New and Mr. Knuth from the Woodbridge commissions paid to Synergy. Mr. New received $115,456 in wages and $164,524 in K-1 Profit distributions, and Mr. Knuth received $110,030 in wages and $164,520 in K-1 Profits.
[3] The parties agree that Defendants have paid $58,923 in settlement payments relating to Woodbridge, which amount, when evenly split between Mr. Knuth and Mr. New, yields a credit to each in the amount of $29,461.50 as Woodbridge settlement payments.

6

Knuth may deduct from their respective disgorgement amounts the income taxes they each paid on their wages as "legitimate business expenses," and (3) whether the SEC has satisfied its burden to reasonably approximate Synergy's ill-gotten gains in calculating the disgorgement amount. Our resolution of these issues is explained below:

### A. Mr. Knuth's Woodbridge Liquidation Claim

Mr. Knuth personally invested in Woodbridge securities, but when Woodbridge filed for bankruptcy, Mr. Knuth waived any claim he would have had based on his note, thereby relinquishing his claim in the Woodbridge Liquidation matter. Defendants seek an authorization by the Court to deduct the surrendered claim in the amount of $36,000. In response, the SEC maintains that Mr. Knuth should receive no more than the same percentage of the value of his claim that other investors have and will likely receive in the bankruptcy, which is currently set at 43.7% of the investor's net note claim.[4] Thus, while the SEC agrees that Mr. Knuth is entitled to receive some level of credit for his waived note claim, the amount should not exceed $14,652.90, which the SEC computes as follows: the original value of his claim, $50,000; less pre-petition distributions in the aggregate amount of $16,500; multiplied by the 43.74% recovery rate on other net note claims.

Mr. New and Mr. Knuth acknowledge that the victims of the Woodbridge Ponzi scheme will never recover 100% of their individual investments. We agree that it would

---

[4] The SEC has utilized the recovery percentage on net note claims reported on the Woodbridge Liquidation Trustee's website, which states that overall recovery, as of March 28th, 2022, is equivalent to 43.74%. *See* https://woodbridgeliquidationtrust.com/faq/ (indicating a "43.74% recover on Net Note Claims" under the "How much will I recover overall?" tab).

be inequitable for Mr. Knuth to be allowed to deduct the full $36,000, since that amount would not have been available had his claim been included in the Woodbridge bankruptcy proceedings. Accordingly, we find that $14,652.90 is the appropriate deduction to which Mr. Knuth is entitled from his disgorgement figure.

## B. Defendants' Income Taxes

Defendants each also seek a credit against their disgorgement amount to reflect the amount of taxes each paid on his earnings from Woodbridge.[5] We know of no legal authority, and the Defendants have cited us to none, which supports a deduction for income taxes paid by Defendants on their ill-gotten gains. *See SEC v. Durham*, 799 F. App'x 928, 930 (7th Cir. 2020) ("To calculate disgorgement, courts focus on the sum derived through fraud, not on how the fraudster used the money."); *Donell v. Kowell,* 533 F.3d 762, 779 (9th Cir. 2008) (declining to allow good faith investors in a Ponzi scheme to offset disgorgement by amounts paid in federal income taxes); *SEC. v. U.S. Pension Tr. Corp.*, 444 F. App'x 435, 437 (11th Cir. 2011) (holding that no authority requires the court to deduct from the disgorgement figure the amount of ill-gotten gains paid to the government in income tax); *SEC. v. Merch. Cap., LLC*, 486 F. App'x 93, 96 (11th Cir. 2012) (rejecting argument that the district court was required to take into account the amount of income taxes paid); *SEC. v. Arias*, No. 12-cv-2937, 2021 WL 7908041, at *6 (E.D.N.Y. Nov. 11, 2021) (collecting cases). Consistent with these rationales, we hold

---

[5] According to Defendants, Mr. New should receive a tax credit of $56,527 and Mr. Knuth should receive a tax credit of $62,791.

that the income taxes paid by each Defendant on their Woodbridge earnings were not direct transaction costs and thus are not properly regarded as deductible.

### C. Synergy's Disgorgement Amount

The parties disagree as to the appropriate amount to be disgorged by Synergy, based on each side's interpretation of Synergy's legitimate business expenses eligible for deduction pursuant to *Liu*. The SEC claims that the appropriate disgorgement amount for Synergy is $1,026,513.70 (before prejudgment interest), calculated on the basis of Synergy's total Woodbridge transaction-based commissions less the final disgorgement amounts for Mr. New and Mr. Knuth. While Defendants do not expressly oppose this method of calculating Synergy's beginning disgorgement amount, they counter that, once Synergy's legitimate business expenses are deducted, Synergy's total disgorgement amount before prejudgment interest would be only a fraction of the SEC's proposed disgorgement amount, to wit, $147,900.80.

*Liu* directs in relevant part that "courts must deduct legitimate expenses before order disgorgement under § 78u(d)(5)." *Liu*, 140 S. Ct. at 1950. In general, "[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021) (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (quotation marks omitted)). Once the SEC has established a reasonable approximation of the amount ill-gotten gains, the burden shifts to the defendants to demonstrate, if possible, that the SEC's estimate is not reasonable. *See, e.g.*, *United States Commodity Futures Trading Comm'n v. Tayeh*, 848 F. App'x 827, 828

9

(11th Cir. 2021). Any risk of uncertainty regarding the disgorgement amount "fall[s] on the wrongdoer whose illegal conduct created that uncertainty." *Fowler*, 6 F.4th at 267 (quoting *Razmilovic*, 738 F.3d at 31 (quotation marks omitted)).

In establishing the appropriate, reasonable disgorgement amount, the SEC distinguished between Defendants' legally and illegally derived profits, including only the transaction-based commissions paid to Synergy by Woodbridge in the disgorgement tally. Defendants respond that, based on *Liu*, they are entitled to have all legitimate business expenses deducted.

Defendants were provided extensive (and extended) opportunities to muster the evidence that would allow them to rebut the disgorgement and civil penalty amounts proffered by the SEC. Numerous status and settlement conferences were conducted by the Court in an effort to allow Defendants the necessary time to satisfy their burden of proof, including time for additional discovery as well as two evidentiary hearings. In the end, the only submission Defendants have proffered is a theory, arguing that they are entitled to a deduction in excess of $1M in "calculated" expenses, which deduction reflects the total amount of *all* of the line-item expenses listed on their yearly tax returns during the relevant time period.[6] Defendants have calculated their business expenses by multiplying their total cumulative tax return expenses by the percentage of their yearly

---

[6] This theory appears to be something of a "hail Mary" play, to borrow the phrase, since the tax returns on which it is based were provided by Defendants only during the last month in conjunction with the Court hearing, despite the fact that this case has been pending for more than four years.

income from their Woodbridge commissions.[7] This calculation lacks any supporting documentation or specific justifications for the amounts listed in those tax returns, without which support it is only a theory.

      Defendants' failures foreclose a *Liu* analysis. Credible evidence to establish appropriate reductions from the stipulated ill-gotten gains disgorgement amount has not been introduced. Mr. New testified that Synergy does not have possession of or access to income statements and Defendants personally have no receipts to substantiate their alleged expenses or other documentation of expenses claimed on their tax returns. Defense counsel repeatedly has represented that Defendants retained no receipts, no bank records, or other form of evidence connecting their claimed expenses to their Woodbridge business. Even if the company had access to such substantiation, according to defense counsel, it would be of no use because the company never actually itemized *any* of its expenses. Defendants' proffer is actually a "guesstimate" when they claim that they incurred more than $1,000,000 in business expenses which should be deducted from

---

[7] Defendants' theory fails for reasons beyond their method of calculation. The evidence shows that by taking *all* of the line-item expenses listed on their tax returns to perform their calculation, expenses that are clearly personal would be included, rather than those expenses related only to the accrual of legitimate business. For example, the following expenses, *inter alia*, were listed on Defendants' tax returns during the years 2014–2017: $78,192 for personal automobile expenses, $21,858 for an extended trip to Florida for the purpose of looking at potential vacation rentals and also including one board meeting, $11,598 for charitable deductions, $155,450 for compensation of a company officer without any connection to Woodbridge business, $35,000 for the unrelated officer's assistant's salary (which is, Defendants admit, merely an estimate since they have no documentation regarding the precise amount paid annually to the assistant), $109,385 for advertising (despite Defendants' admission that they spent nothing on Woodbridge advertising), $434 for an unrelated police report expense. Following the first evidentiary hearing, Defendants were instructed to re-calculate their requested expenses after taking out the expenses unrelated to legitimate business. They did not do so, and a calculation based on such demonstrable errors is both unreliable and unpersuasive.

their disgorgement tally because, they argue, all the claimed expenses benefitted the company in some fashion. This theory, however, is not evidence; as such, it is clearly insufficient. *See Tayeh*, 848 Fed. Appx. at 830 (affirming and imposing plaintiff's reasonable approximation of defendant's ill-gotten gains when defendant "failed to provide concrete and credible evidence to demonstrate the amount of money spent on any of the alleged business expenses or whether any of the business expenses were legitimate, and he obscured any reasonable calculation of legitimate expenses due to his inadequate recordkeeping").

Accordingly, we conclude that the SEC has satisfied its burden to establish a reasonable approximation of Defendants' profits causally related to the Woodbridge fraud. We also hold that Defendants have failed to meet their corresponding obligation to demonstrate that the disgorgement figure is not a reasonable approximation of these profits. Thus, the SEC is entitled to a disgorgement from/by Synergy in the amount of $1,026,513.70, prior to any additional assessment covering prejudgment interest.

### II.  Civil Penalty

In civil enforcement actions such as this, the SEC is authorized to seek both civil penalties and "equitable relief." 15 U.S.C. §§ 78u(d)(3), 78u(d)(5); *Liu*, 140 S.Ct. at 1940 (holding that disgorgement is permissible "equitable relief"). In determining whether to impose a civil penalty, and if so, how much, for violations of federal securities law, a "court should generally consider factors such as: 'the seriousness of the violation; the defendant's scienter; the repeated nature of the violations; whether the defendant has admitted wrongdoing; the losses or risk of losses caused by the conduct; any cooperation

provided to enforcement authorities; and ability to pay.'" *SEC v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019) (quoting *SEC v. Zenergy Int'l, Inc.*, No. 13-CV-5511, 2016 WL 5080423, at *16 (N.D. Ill. Sept. 20, 2016)).

Rather than seeking the full statutory amount authorized for a First-Tier penalty under Section 20(d) of the Securities Act, 15 U.S.C. §77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §78u(d)(3),[8] the SEC has reduced its requested assessment to $200,000 as a civil penalty against each Defendant individually, which amount, according to the SEC, reflects the fact that, though not charged with fraud, Defendants' actions represented serious violations of the law occurring over a period of several years and resulting in significant losses to investors.

The SEC cites Defendants' failure at the outset of their business relationship with Woodbridge to undertake any due diligence investigation to evaluate the legality of the Woodbridge financial product(s) they sold to their clients. Further, despite their litigiousness regarding the issues of disgorgement and civil penalties, Defendants have never provided a single bit of evidence to substantiate a single expense related to their Woodbridge business. True, Defendants have admitted wrongdoing and acceded to the restrictions imposed by the permanent injunction, but they have not otherwise fully and openly and willingly cooperated in the SEC's investigation. *Slowinski*, 2020 WL

---

[8] The Court may impose a penalty of up to (i) $9,472 on an individual defendant for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation. 15 U.S.C. §77t(d); 15 U.S.C. §78u(d)(3). The SEC contends that it could seek a First-Tier penalty for each of the Defendants' violations, to wit, for each of the more than 100 investors the Defendants sold to, or a civil penalty equal to the gross amount of pecuniary gain.

7027639, at *6 (requiring insolvent defendant to pay civil penalty of $84,750 when his "cooperation" merely involved meetings with the SEC and consent to injunctive relief). Finally, while Defendants describe their respective current financial situations as bleak, the SEC, through its own independent investigation, has discovered that Defendants have been less than transparent and forthcoming regarding their ability to pay a civil penalty. For example, the evidence reflects that Defendants jointly and severally still possess considerable assets, including *inter alia*, the $315,000 gained from the sale of their client lists, which transaction includes a future opportunity to acquire an additional $200,000 if the new owner of the list achieves certain sales benchmarks. Defendants also jointly own a commercial property which yields a consistent monthly income. Mr. New testified that, since he can no longer work as a financial advisor, he has been relegated to hourly employment at a candy shop; however, he failed to disclose until pressed to do so that this candy shop is actually a marital asset, namely, a franchise business owned by his wife. Accordingly, we conclude that some level of civil penalty is warranted.

 Taking into account Defendants' evidence offered in mitigation of a civil penalty, we shall award an amount somewhat below the level requested by the SEC. Defendants have exhibited genuine remorse over their securities law violations, maintaining that they never intended to deceive their clients (many of whom were family members and close friends) and will forever feel deep guilt for the injuries they caused through their actions. Defendants maintain that, having admitted wrongdoing and settled every other claim against them connected to their Woodbridge business, they have demonstrated both their remorse and responsibility. Perhaps most significant to us is the fact that, at the very

14

beginning of this litigation, Defendants stipulated to the entry of a permanent injunction, thereby ending their careers as financial advisors, which profession they had engaged in for decades, and necessitating entirely new employment ventures in order to support themselves and their families. Taking into account these facts, we find a civil penalty of $50,000 for Mr. New, a civil penalty of $50,000 for Mr. Knuth, and a civil penalty of $100,000 for Synergy to be warranted and reasonable as sanctions for Defendants' wrongdoing while crediting their efforts to mitigate the harm they caused.

### III. Conclusion

In summary, the following assessments shall be and are hereby imposed:

- **Against Mr. New: $348,815.85 TOTAL**, computed as follows —
    - Disgorgement: ($115,456 in wages + $164,524 K-1 Profit distributions = $279,980), less $29,461.50 Woodbridge settlement payments = $250,518.50
    - Prejudgment interest: $48,297.35
    - Civil Penalty: $50,000
- **Against Mr. Knuth: $324,861.20 TOTAL**, computed as follows —
    - Disgorgement: ($110,030 wages + $164,520 K-1 Profits = $274,550), less $29,461.50 Woodbridge settlement payments, and less $14,652.90 Woodbridge Liquidation note waiver = $230,435.60
    - Prejudgment interest: $44,425.60
    - Civil Penalty: $50,000
- **Against Synergy: $1,324,414.87 TOTAL**, computed as follows —

15

- o   Disgorgement: $1,507,467.80 total ill-gotten gains, less $250,518.50 New disgorgement, less $230,435.60 Knuth disgorgement = $1,026,513.70
- o   Prejudgment interest: $197,901.17
- o   Civil Penalty: $100,000

Final judgment (including injunctive relief) shall issue accordingly.[9]

IT IS SO ORDERED.

Date:
_____4/26/2022_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[9] The form of the final judgment was proposed by the SEC as consistent with their practice. We are mindful of the Seventh Circuit preference for a separate injunction order but have deferred to the SEC's request.

Distribution:

Jonathan A. Bont
PAGANELLI LAW GROUP
jon@paganelligroup.com

Ian P. Goodman
PAGANELLI LAW GROUP
ian@paganelligroup.com

Scott Alan Kreider
ALERDING CASTOR LLP
skreider@paganelligroup.com

Stephanie N. Moot
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
moots@sec.gov

Christine Nestor
U.S. SECURITES AND EXCHANGE COMMISSION (Miami)
NestorC@sec.gov

Teresa Jacqueline Verges
Securities and Exchange Commission
vergest@sec.gov